IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| FREDRICK GOODEN, #1013573 | § | |
| A.K.A. MA'MIN AL-NABA | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 6:04cv127 |
| | § | |
| C. CRAIN, ET AL. | § | |

MEMORANDUM OPINION AND
ORDER OF DISMISSAL

Plaintiff Fredrick Gooden a.k.a. Ma'min al-Naba, an inmate confined at the Coffield Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis*, filed this lawsuit pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc. The case was transferred to the undersigned pursuant to 28 U.S.C. § 636(c).

History of the Case

The complaint was filed on March 15, 2004. The Plaintiff, a Muslim inmate, alleged that he should be permitted to grow a quarter inch beard in accordance with his religious beliefs. On June 30, 2004, the Court conducted an evidentiary hearing, in accordance with *Spears v. McCotter*, 766 F.2d 179, 182 (5th Cir. 1985), wherein the Plaintiff's claims were considered. The Plaintiff argued that denying him the right to grow a quarter inch beard for religious reasons while allowing other inmates to grow quarter inch beards for medical reasons violates his rights under the Equal Protection Clause. He also argued that he should be permitted to grow a quarter inch beard under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. He

sued the Texas Board of Criminal Justice Chairman C. Crain, the Texas Board of Criminal Justice, TDCJ Director D. Dretke and Director of Chaplaincy B. Pierce. The Defendants were ordered to answer. On August 19, 2004, the Texas Board of Criminal Justice's motion to dismiss was granted.

On October 21, 2004, the case was administratively closed while the Supreme Court considered the constitutionality of RLUIPA in *Cutter v. Wilkinson*, 125 S.Ct. 2113 (2005). On May 31, 2005, the Supreme Court unanimously upheld the statute and concluded that it did not violate the Establishment Clause. The present case was returned to the active docket.

On October 5, 2005, the Court denied the Defendants' motion to dismiss the RLUIPA claims based on the argument that the statute is unconstitutional. *Gooden v. Crain*, 389 F.Supp.2d 722 (E.D. Tex. 2005). In the opinion, the Court reminded the parties that any challenge to the grooming policy based on the Free Exercise Clause is frivolous. *Id.* at 725.

<u>Evidentiary Hearing</u>

An evidentiary hearing concerning the Plaintiff's request for injunctive relief was conducted on December 7, 2005. The parties were notified that their motions for summary judgment (docket entry numbers 40, 41, 55 and 56) would be taken under advisement pending the evidence and arguments presented during the hearing. The Plaintiff's evidence consisted of his own testimony, along with the testimony of inmate Robert L. Russell. The witnesses testifying for the Defendants were Muslim Chaplain Omar Shakir, Deputy Director Nathaniel Quarterman, Regional Director William Stephens, Chaplaincy Director Bill Pierce and Dr. Ken Kuykendall.

The Plaintiff testified that he was first introduced as a Muslim when he was eighteen years old. He is currently thirty years old. His beliefs and commitment to Islam have deepened over the years, particularly due to his study of the Quran. He attends most Jumah prayer services conducted

at the Coffield Unit, and he always participates in Ramadan activities. It is his understanding and belief that he must follow the example of the Prophet Mohammed, who wore a beard. He acknowledged that the sole mention of a beard in the Quran, which concerned Moses, had nothing to do with whether Muslim men are required to wear a beard. Nonetheless, the requirement that he follow the example of Mohammed mandates that he wear a beard. Male Muslims who shave are acting outside of the Quran. He testified that he is not complying with his religion to the extent that he complies with the prison grooming code to be clean shaven. He asserted that he is not being allowed to fully express his Islamic faith.

The Plaintiff testified that he should be permitted to grow a quarter inch beard since inmates with razor bumps are permitted to grow a quarter inch beard. Clipper shave passes are given to these inmates. He noted that the explanation given for not allowing Muslim inmates to wear quarter inch beards concerns security, but apparently there is not a security problem to the extent that inmates with razor bumps are permitted to grow quarter inch beards. He does not believe that quarter inch beards pose a security problem. He cannot hide weapons in a quarter inch beard. On cross-examination, he acknowledged that he is permitted to attend Jumah prayer services and participate in Ramadan activities. He acknowledged that he is permitted to shower and clean before Jumah prayer services. He is permitted to have a prayer rug. Prison officials allow Muslim inmates to keep prayer beads, Kofi caps, religious medallions and religious literature. He, nonetheless, reiterated that he cannot fully express his Islamic beliefs by being clean shaven.

Inmate Robert L. Russell testified that he has been a Muslim all of his life. He is currently 38 years old. He has a short beard because he has a clipper shave pass for razor bumps. His clipper shave pass is always reissued because of his skin condition. He testified that Islam requires males

after reaching puberty to forego shaving. This is based on the teaching that Muslims shall not alter their physical appearance. He testified that the discussion of a beard in the Quran involving Moses had nothing to do with the requirement of wearing a beard. Muslims are required to follow the example of Mohammed. Muslims who shave will have to answer for not following the example of Mohammed. On cross-examination, he noted that the Sunna, or Sound Traditions, is separate from the Quran and provides examples of practices of Mohammed, including the wearing of a beard. He noted that he does not wear a full quarter inch beard because he keeps his beard just long enough to avoid razor bumps. He testified that he cannot hide anything in his beard.

Chaplain Omar Shakir testified that he first became an Iman, or religious leader, in 1983. An Iman is selected from among a group of people by the people to represent or lead them. He became a Muslim chaplain for the Texas prison system in 1996. He is responsible for 26 units. He discussed the significance of the Six Articles of Faith and Five Pillars of Islam. He testified that the prison system provides for the fundamental needs of Muslim inmates, particularly prayer services. He testified that the Quran does not mandate the wearing of a beard. There are examples of Mohammed wearing a beard, but he distinguished between Mohammed's religious practices and his cultural practices. He testified that wearing a beard does not make a person righteous. He noted that he wears a beard, although he does not believe that it is required. He acknowledged that Muslim scholars have differing opinions as to whether wearing a beard is required. Chaplain Shakir concluded his direct testimony by offering the opinion that the requirement that inmates be clean shaven does not substantially burden the practice of the Muslim religion.

On cross-examination, Chaplain Shakir stressed that Islam focuses on the inner man, not the outward appearance. He again testified that there are different schools of thought as to the necessity

for beards. He, nonetheless, distinguished between Mohammed's mandates and his personal practices. He noted the example of Mohammed making the recommendation to forego using fertilizer and his subsequent admission that the recommendation did not work. The example provides a discussion about Mohammed that has nothing to do with a religious mandate. He characterized Mohammed wearing a beard as a personal practice but not a religious mandate.

Deputy Director Nathaniel Quarterman testified that the mission of the prison system is to safely confine prisoners. It costs about $40 a day to house an inmate. The Board of Criminal Justice adopted the grooming code requiring inmates to be clean shaven. The policy was adopted for security reasons. It was not adopted to have an adverse impact on any particular group. An inmate will be disciplined if he fails to comply with the grooming code. Repeated violations can ultimately lead to confinement in administrative segregation. There are many security reasons for the policy requiring inmates to be clean shaven. One reason is to require inmates to maintain a clean and orderly appearance. Another reason is to prevent gangs from adopting an appearance to signify membership in a particular gang.

A significant reason for the clean shaven rule concerns identification of inmates. All inmates are required to keep an identification card in their possession. An identification card includes a picture of the inmate with short hair and being clean shaven. It is more difficult to identify an inmate if he does not keep his appearance consistent with his appearance as shown on the identification card. Escapes occur with some frequency, and the pictures of the inmates are vital in apprehending them. All inmates need to be identified quickly and correctly, and their pictures are used in identifying them.

Deputy Director Quarterman testified that all inmates, other than those with clipper shave passes, shave with disposable razors. At one time, inmates were allowed to own electric razors. That practice ended because inmates modified the razors into weapons and tattoo guns. Tattooing is a problem in the prison system, particularly with regard to health concerns. The prison system banned the use of electric razors due to the problems associated with them. Clipper shavers are similar to electric shavers. Inmates must now go to the barber shop to use a clipper shaver. If more clipper shave passes are issued because of religious reasons, then additional barber shops will be required and additional officers will be needed to supervise them.

Deputy Director Quarterman testified that he believes that granting Muslim inmates the right to wear a quarter inch beard will lead to problems with officers wanting to grow beards and other inmates wanting to grow beards. He noted that officers may not grow beards because they would interfere with gas masks and pose a safety risk with respect to the use of industrial equipment. He noted that inmates express their religious preferences, which are documented on their travel cards. Security personnel cannot question the legitimacy of the designated religious preference. The number of clipper shave passes issued would likely grow exponentially if Muslim inmates are permitted to grow quarter inch beards because additional inmates will claim to be Muslim.

Deputy Director Quarterman testified that the Texas Legislature has authorized 28,000 officer positions. Only 23,000 positions have been filled. Requiring the prison system to permit Muslim inmates to grow quarter inch beards would have a profound impact on manpower. TDCJ would need additional employees, but they cannot fill all of the positions presently allotted. The job duties of existing positions would have to be altered. The economic significance would also require taking away some privileges and programs to pay for the increases associated with additional barber shops.

Quarterman testified that the practical effect of permitting Muslim inmates to wear quarter inch beards is that it would have a major impact on operations and would be a major funding event.

Deputy Director Quarterman testified that he is in contact with other prison systems. The grooming policy in Texas is consistent with the state prison systems in California and Florida. On the other hand, the Federal Bureau of Prisons permits inmates to wear beards and long hair. He noted that the cost to house a federal inmate per day is $63, as opposed to $40 per day to house a Texas prison inmate. The Federal Bureau of Prisons has much more money to spend on security, particularly technology, such as x-ray machines, metal detectors and computers that can identify people. The Texas prison system simply has less money than the Bureau of Prisons. The added security requirements associated with beards are not economically feasible in light of the budget. He noted that clipper shave passes issued for medical reasons is an economic burden and requires high maintenance, but the decision to issue a clipper shave pass is a medical decision, as opposed to a security decision. He has no control over who receives a clipper shave pass for medical reasons. He expressed the opinion that a requirement to permit Muslim inmates to wear quarter inch beards would spread to other religions as well and would jeopardize the effective functioning of the system, particularly with respect to identification.

Regional Director William Stephens provided testimony similar to the testimony of Deputy Director Quarterman. He provided unique testimony concerning manpower shortages. He testified that approximately 25% of the officers have less than a year experience. A starting officer makes only $1,800 a month. All officers make on average $2,400 a month. At the present time, many work tasks are omitted due to the lack of personnel. Other tasks are inadequately performed due to the lack of personnel. If Muslim inmates are permitted to grow quarter inch beards, then an additional

burden will be placed on officers, who are already spread too thin. The Coffield Unit has 3,800 inmates. Presently, 266 inmates have clipper shave passes. The number would double if Muslim inmates are allowed to grow quarter inch beards. He also noted that officers would have to slow down to identify inmates with beards when comparing them to their identification card pictures. He noted the importance of accurate pictures with respect to two recent escapes. The escapees were captured when members of the public reported seeing the escapees after seeing their pictures on the news. Success in recapturing inmates requires the use of accurate pictures, and uncertainty in an escapee's appearance makes apprehension more difficult.

Chaplaincy Director Billy Pierce testified that the primary role of chaplains is to aid and assist inmates to grow in their faith. There are approximately 150 different faith groups. The chaplains try to accommodate inmates in the practice of their religion, as long as an accommodation does not compromise security. The Religious Practice Committee considers requests for an accommodation. The Committee is not permitted to grant accommodations regarding security issues, such as exemptions from the grooming code. The primary duty of chaplains is to assist inmates to grow in their faith, but they also have administrative duties. There are 94 unit chaplains, plus four Muslim chaplains who attend to the needs of the Muslim inmates. The particular rights of Muslim inmates, including the number of Muslim chaplains, is governed by a consent decree in *Brown v. Beto*. The consent decree has a formula that determines the number of Muslim chaplains based on the number of Muslim inmates. The budget of the Chaplaincy Department is provided by the Texas Legislature. The budget was cut 40% in 2003, resulting in a reduction in personnel. If Muslim inmates are permitted to grow quarter inch beards, then there would be a large increase in administrative duties, such as the issuance of clipper shave passes. It is also felt that there would be

an increase in the number of inmates claiming a religious need to grow a beard. Chaplain Pierce noted that before Native American inmates were allowed to smoke tobacco in sacred pipe ceremonies, there were only 25 inmates who claimed to be practitioners of the Native American religion. He noted that tobacco is not otherwise permitted in the prison system. After the sacred pipe exception was made, several thousand inmates claimed to be practitioners of the Native American religion. It is felt that many inmates will falsely claim to be Muslim inmates if they are permitted to grow beards. The chaplains do not question the religious affiliation professed by an inmate. If more inmates claim to be Muslim just to grow a beard, then portions of the Chaplaincy Department's budget will have to be shifted to Muslim activities regardless of whether the increase in the number of inmates professing to be Muslim is legitimate.

The final witness was Dr. Ken Kuykendall. He testified that he supervises the medical care provided to inmates at the Coffield and Michael Units. Clipper shave passes are issued to inmates with razor bumps for a condition known as Pseudo-Folliculitis Barbae. The condition may also be treated with topical solutions, such as Benzoyl Peroxide. The condition may be serious and uncomfortable and lead to permanent scarring and open sores with drainage. Clipper shave passes are occasionally issued to inmates with other facial problems, such as burns and severe acne. Clipper shave passes are issued only for medical reasons and not for religious or non-medical reasons. The clipper shave passes authorize an inmate to grow a quarter inch beard. The time limit for a clipper shave pass varies by unit, but the normal limit at the Coffield Unit is six months. An inmate is reexamined at the end of the period for a determination as to whether the pass should be reissued. Dr. Kuykendall finally testified that there is no feasible alternative to clipper shave passes.

Discussion and Analysis

RLUIPA provides that no "government shall impose a substantial burden on the religious exercise of a person residing in or confined in an institution," unless the government shows that the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). The Fifth Circuit fully explored the burdens of persuasion associated with RLUIPA in *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004). The Plaintiff must initially show that the governmental practice complained of imposes a "substantial burden" on his religious exercise. *Id.* at 567. This requires the court to answer two questions: (1) is the burdened activity "religious exercise," and if so (2) is the burden "substantial"? *Id.* RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* Congress provided a broad definition of religious exercise. *Id.* In *Adkins*, the Fifth Circuit held that Sabbath and holy days activities easily qualify as "religious exercise." *Id.* at 567-68. The Fifth Circuit held that a government action or regulation creates a "substantial burden" on a religious exercise if it truly pressures an adherent to significantly modify his religious behavior and significantly violate his religious beliefs. *Id.* at 570. The Fifth Circuit reiterated that courts are not to inquire into the centrality of a religious practice in deciding this question. *Id.* at 570-71. The Fifth Circuit held that the prison policy permitting inmates to congregate for religious activities only when qualified free world volunteers were present did not place a substantial burden on the free exercise of religion. *Id.* at 571. The Fifth Circuit did not develop the least restrictive means test since there was no substantial burden on religious exercise.

In the present case, the Plaintiff acknowledged that he is permitted to practice his religion. He is permitted to attend Jumah prayer services and participate in Ramadan activities. He is

permitted to shower and clean before prayer services. He is permitted to have a prayer rug, prayer beads, a Kofi cap, a religious medallion and religious literature. He acknowledged that he studies the Quran, Arabic and other religious materials. Nonetheless, he is not permitted to fully express his religious beliefs when prison rules require him to be clean shaven. Islamic scholars are not in agreement as to whether Muslim men must grow beards, and this Court may not attempt to decide the issue. Nonetheless, the Plaintiff is clearly permitted to practice the fundamental aspects of his religious beliefs and the grooming policy does not impose a substantial burden on the practice of his religious beliefs.

On the other hand, even if the grooming code placed a substantial burden on the Plaintiff's practice of his religious beliefs, the grooming code furthers the compelling governmental interest of security and does so by the least restrictive means. In *Thompson v. Scott*, 86 Fed. Appx. 17, 19 (5th Cir. 2004), the Fifth Circuit noted that the standards under RLUIPA are nearly the same as the standards of RFRA and that the Court upheld the Texas prison system's grooming standards under RFRA in *Diaz v. Collins*, 114 F.3d 69, 73 (5th Cir. 1997). In *Diaz v. Collins*, the Fifth Circuit held that the grooming policy with respect to hair length was related to security and thus a compelling state interest. 114 F.3d at 73. The Fifth Circuit noted that long hair facilitates the transfer of contraband and weapons and the grooming policy makes it more difficult for escaped prisoners to alter their appearance. *Id.* The security interest at stake could not be meaningfully achieved by any different or lesser means than hair length standards. *Id.*

In the present case, the Defendants properly argued that they are entitled to summary judgment in light of *Diaz*. Indeed, summary judgment would be proper based on the decision in that case and because the standards employed in *Diaz* are the same as the standards in RLUIPA. The

testimony in the present case further developed the reasons underlying the decision in *Diaz*. As was shown in *Diaz*, Deputy Director Quarterman's testimony showed that the grooming policy is related to the compelling governmental interest of security, particularly with respect to the identification of inmates. The testimony of both Deputy Director Quarterman and Regional Director Stephens showed that the goals could not be meaningfully achieved by any other means. Accurate pictures of inmates are essential for identification both inside the prison facilities and in the free world. Officers must be able to quickly and accurately identify inmates. The pictures are essential in the identification and apprehension of escapees. No other alternatives are feasible.

It is further noted that the Supreme Court in *Cutter* specified that Congress anticipated that courts would apply the RLUIPA standards with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." 125 S.Ct. at 2123 (citations omitted). The testimony of the Defendants clearly revealed that a court decision permitting inmates to wear quarter inch beards for religious reasons would have a major impact on security procedures and costs. The Texas prison system is already undermanned and has limited resources. A decision to permit inmates to wear quarter inch beards for religious reasons would further strain operations and be a financial burden. The Court could order the Defendants, hence the State of Texas, to allow inmates to grow quarter inch beards for religious reasons regardless of the costs, but such a mandate would be contrary to the intent of Congress to give due deference to prison administrators with consideration to costs and limited resources. There is no feasible alternative for achieving the objectives of the grooming code. The Defendants have satisfied their burden under RLUIPA. The Plaintiff is not entitled to relief under the statute.

The next issue before the Court is whether the grooming regulation denies the Plaintiff equal protection. The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985); *Plyler v. Doe*, 457 U.S. 202, *reh. denied*, 458 U.S. 1131 (1982). To succeed in an equal protection claim, a plaintiff must prove purposeful discrimination resulting in a discriminatory effect among persons similarly situated. *McCleskey v. Kemp*, 481 U.S. 279 (1987); *Muhammad v. Lynaugh*, 966 F.2d 901, 903 (5th Cir. 1992). "Discriminary purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995) (*citing United States v. Galloway*, 951 F.2d 64, 65 (5th Cir. 1992)). A plaintiff must prove specific acts supporting a claim of discrimination, as opposed to his personal belief that discrimination played a part in the situation. *Id.*

The Plaintiff's equal protection claim is based on *Taylor v. Johnson*, 257 F.3d 470 (5th Cir. 2001). As in the present case, Taylor asserted he should be permitted to wear a quarter inch beard due to his religious beliefs because the grooming policy allows beards for medical reasons. The Fifth Circuit noted that Taylor had to "allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Id.* at 473 (citations omitted). The Fifth Circuit reiterated that *O'Lone* requires "courts afford appropriate deference to prison officials, . . . prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* at 474 (citing *O'Lone*,

482 U.S. at 349). Finally, the Fifth Circuit noted that Taylor had to demonstrate that prison administrators purposefully intended to discriminate against him as a member of an identifiable group. *Id.* The Fifth Circuit remanded the case to the district court for further consideration.

On remand, United States District Judge Kenneth M. Hoyt issued an injunction prohibiting Texas prison officials from enforcing the shaving policy to the extent that it violated Taylor's right to wear a beard of no more than one quarter-inch in length. *Taylor v. Cockrell*, No. 4:00cv2809 (S.D. Tex. Sept. 24, 2002). It is noted that Judge Hoyt issued the injunction based on RLUIPA, as opposed to the Equal Protection Clause. It is further noted that the Plaintiff in the present case filed a motion for joinder or intervention in the *Taylor* case on October 8, 2002, which was denied on October11, 2002. Both parties filed notices of appeal. The Fifth Circuit vacated the injunction since it was discovered that Taylor had been released from prison and remanded the case for the sole purpose of dismissing Taylor's RLUIPA claim. *Taylor v. Groom*, 74 Fed. Appx. 369, 370 (5th Cir. 2003). It is noted that the Plaintiff's arguments in support of his motion for summary judgment focused on both *Taylor v. Cockrell* and *Lewis v. Scott*, but both cases were eventually dismissed despite momentary victories in the district courts. He relied on cases that lack any precedential value.

This brings us back to the equal protection claim in the present case. The testimony reveals that the Plaintiff has not been treated differently from similarly situated individuals. The grooming code applies equally to inmates of every religious group. There are no exceptions to anyone based on religion. Moreover, the grooming code was not adopted with the intent to discriminate against Muslim inmates. The grooming code was adopted for security reasons without any discriminatory intent. The Plaintiff is not entitled to relief under the Equal Protection Clause.

Finally, the Defendants argued that they are entitled summary judgment based on qualified immunity. The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Layne*, 526 U.S. 603, 614 (1999). The doctrine of qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992), *citing Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The objective reasonableness of an official's conduct must be measured with reference to the law as it existed at the time of the conduct in question. *Anderson*, 483 U.S. at 639; *Jackson v. City of Beaumont Police Department*, 958 F.2d 616, 620 n. 5 (5th Cir. 1992) (citations omitted). *See King v. Chide*, 974 F.2d 653 (5th Cir. 1992) (discussing qualified immunity in the context of force used against an arrestee). The evaluation of a qualified immunity claim involves a two-step inquiry. *Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994); *Colston v. Barhnart*, 130 F.3d 96, 99 (5th Cir. 1997). The first step is to determine whether the plaintiff has shown a violation of a clearly established constitutional right. *Id.* The second step requires the court to determine whether the defendant's conduct was objectively unreasonable under existing clearly established law. *Id.*

An anomaly in the present case exists concerning RLUIPA and damages. RLUIPA does not contemplate recovering damages from individuals, such as the Defendants. Instead, RLUIPA provides for "appropriate relief against a government." 42 U.S.C. § 2000cc-2a. The remedies provided in RLUIPA are complete and omit any mention of damages. The Northern District of Illinois noted that it is unclear whether RLUIPA authorizes damages in addition to injunctive relief.

*Agrawal v. Briley*, No. 02-C-6807, 2003 WL 164225 at *2 n.2 (N.D. Illinois Jan. 22, 2003). Just recently, the Middle District of Alabama likewise noted that it was unclear whether damages are available. *Smith v. Haley*, ____ F.Supp.2d ____, 2005 WL 3220213 at *4-5 (M.D. Alabama Dec. 1, 2005). The Court noted that there is no need to address a qualified immunity analysis if damages are unavailable. *Id.* at *4. The Fifth Circuit has also noted that qualified immunity is not a defense for requests for declaratory and injunctive relief, although damages are possible when a plaintiff files an equal protection claim and the defense of qualified immunity is available when the plaintiff is seeking damages. *Yates v. Stalder*, 217 F.3d 332, 333 n.2 (5th Cir. 2000). Consequently, the defense of qualified immunity is a viable defense with respect to the Plaintiff's claims for damages against the Defendants, but it is not a defense with respect to his request for injunctive relief. Arguments about whether the Defendants are entitled to qualified immunity are irrelevant to the extent damages may be unavailable in RLUIPA cases.

To the extent that damages are potentially available in the present case, neither prong of the qualified immunity analysis is satisfied. As previously explained, the Plaintiff has not shown that he is entitled to relief based on RLUIPA or the Equal Protection Clause. Furthermore, he is not entitled to damages because he cannot satisfy the second prong of the qualified immunity analysis. At the time the lawsuit was filed, the Plaintiff did not have a right to grow a one-fourth inch beard in light of his religious beliefs under clearly established law. The actions of the Defendants in prohibiting him from wearing a one-fourth inch beard was not unreasonable in light of clearly established law. The Defendants are entitled to have the claims against them for damages dismissed based on the defense of qualified immunity.

In light of the foregoing discussion and analysis, the Court is of the opinion and so finds as a matter of law that the Plaintiff is not entitled to relief under either RLUIPA or the Equal Protection Clause. Furthermore, for the same reasons, the Defendants are entitled to summary judgment. It is accordingly

**ORDERED** that the complaint is **DISMISSED** with prejudice. All motions not previously ruled on are **DENIED**.

So **ORDERED** and **SIGNED** this 13 day of **December, 2005.**

JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE