IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| FREDRICK GOODEN, #1013573 A.K.A. MA'MIN AL-NABA | § § § | |
| VS. | § § | CIVIL ACTION NO. 6:04cv127 |
| C. CRAIN, ET AL. | § | |

MEMORANDUM OPINION AND
ORDER OF DISMISSAL

Plaintiff Fredrick Gooden a.k.a. Ma'min al-Naba, an inmate previously confined at the

Coffield Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis*, filed this lawsuit

pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc. The complaint was transferred to the

undersigned pursuant to 28 U.S.C. § 636(c).

History of the Case

The complaint was filed on March 15, 2004. Gooden, a Muslim inmate, argued that he

should be permitted to grow a one-fourth inch beard in accordance with his religious beliefs. On

June 30, 2004, the Court conducted an evidentiary hearing, in accordance with *Spears v. McCotter*,

766 F.2d 179, 182 (5th Cir. 1985), wherein Gooden's claims were considered. Gooden argued that

denying him the right to grow a one-fourth inch beard for religious reasons while allowing other

inmates to grow one-fourth inch beards for medical reasons violates his rights under the Equal

Protection Clause. He also argued that he should be permitted to grow a quarter inch beard under

the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. He

sued the Texas Board of Criminal Justice Chairman C. Crain, the Texas Board of Criminal Justice,

TDCJ Director D. Dretke and Director of Chaplaincy B. Pierce. The Defendants were ordered to

answer. On August 19, 2004, the Texas Board of Criminal Justice's motion to dismiss was granted.

1

An evidentiary hearing was conducted on Gooden's request for injunctive relief on December 7, 2005.  Following the hearing, on December 13, 2005, the lawsuit was dismissed.  Gooden filed a notice of appeal.  On November 21, 2007, the Fifth Circuit remanded Gooden's claims for injunctive relief under RLUIPA.  His motion for class certification was also remanded.  On February 11, 2008, the Court issued an order denying the motion for class certification.  A bench trial on the merits of Gooden's claims was conducted on July 29, 2008.  It is noted that the lawsuit was consolidated with *Gibb v. Crain*, Civil Action No. 6:04cv81, for purposes of the trial.

The Trial Before the Court

Inmates Gooden and Gibb presented their lawsuit jointly at trial.  Their evidence consisted of Gooden's testimony, inmate Louis R. Green's testimony, and documentary evidence.  The witnesses testifying for the Defendants were Chaplaincy Director Bill Pierce and Regional Director William Stephens.

The first witness was Plaintiff Gooden.  At the beginning of his testimony, the parties stipulated that Fredrick Gooden and Garrett Gibb are Muslims.  It was agreed that the prison system has a policy that male inmates are to be clean shaven, although exceptions have been granted for inmates with razor bumps.  The parties also stipulated that some Muslim males wear beards while others do not.  Gooden testified that all Muslims do not follow the same schools of thought.  He agreed that the Quran does not require Muslim men to wear beards.  On the other hand, the Sunna, which is separate from the Quran, provides examples of the practices of Mohammed, including the wearing of a beard.  Gooden testified that Muslims are supposed to follow the examples of Mohammad, thus he is obligated to grow a beard.  Following the example of Mohammad by growing a beard shows obedience to Allah.  Gooden quoted from Surah 72:23 (Exhibit I): "Mine is only to convey what I receive from Allah.  And His Messages: For any that disobey Allah and His Messenger - for them is Hell; they shall dwell therein forever."  He also read from Surah 4:80: "He who obeys the Messenger, obeys Allah . . ."  Gooden testified that shaving one's beard is an act of disobedience to Allah's will.  Allah's messenger cursed men who assumed the appearance of

2

women.  He added that wearing a beard distinguishes men from women.  Gooden noted that inmates are routinely searched.  The routine searches do not include searches of men's hair on either the top of their heads or on their faces.  Gooden noted that the grooming policy (Exhibit A), does not specify a limit to the length of a person's hair.  An inmate's hair can be considerably longer than one-fourth inch, and it is not considered a security problem.  He argued that a one-fourth inch beard likewise would not pose a security problem.  Gooden testified he was not aware of any inmates receiving a disciplinary case for growing a beard because it was a threat to security; instead, disciplinary cases for beards are issued for violating the grooming code.

On cross-examination, Gooden testified that he is permitted to go to Jumah prayer services, Taleem and Islamic services.  He is normally permitted to shower before prayer services.  He has a prayer rug and Kofi cap.  He has been denied prayer beads.  He is permitted to have a medallion, but he does not have one.  Gooden testified that he can study the Quran.  He acknowledged that he has facial hair.  He noted that he is confined in high security, and security personnel working in high security are not concerned with his facial hair.  Thus he does not have to shave.  Nonetheless, he asked for injunctive relief to grow a one-fourth inch beard.

On redirect, Gooden testified that he can still receive a disciplinary case for not being in compliance with the grooming code.  He is confined in high security and does not agree with the policy.  He reiterated that he is not bothered by high security personnel because he has a beard; nonetheless, it is still a violation.  He further testified that inmates in high security still receive disciplinary cases when caught with contraband.

The next witness was inmate Louis R. Green, who is Muslim.  It was noted that he has a clipper shave pass for razor bumps.  The Plaintiffs wanted him as a witness to show that a one-fourth inch beard is not a security threat.  He could not hide anything in a one-fourth inch beard.  Green testified, however, that security personnel made him shave with a clipper shaver just before coming to the trial.  He was clean shaven.  He ordinarily wears a beard that is up to one-fourth inch in length.  No additional security precautions have been employed when he has been searched in the past due

3

to his beard.  The policy regarding clipper shave passes (Exhibit C) was discussed.  The policy authorizes medical personnel to issue a pass when a medical condition is present due to an infection and/or microabscess formation.  A male inmate does not have to shave when he has been issued a clipper shave pass, but he is required to keep his facial hair clipped to no more than one-fourth inch in length.  Green testified that he was aware of an inmate who was given a clipper shave pass because he was considered a threat to himself due to the possibility of self-mutilation.  Green testified that he has had a clipper shave pass since 1997/1998.

On cross-examination, Green testified that he attends Jumah prayer services and Taleem Islamic studies.  He owns a prayer rug, has prayer beads, and a copy of the Quran.  He is permitted to own a medallion, but he does not have one.  He does not use a razor since he has a clipper shave pass.  He testified that Islam teaches that he cannot be forced to be a Muslim.  Each individual person must practice Islam in his own way.  He testified that he does not believe that it is wrong to shave since he is in a situation where he must shave.  He recognizes that some Muslims believe that they must wear a beard, but he does not believe that.  If a person is in a situation where he cannot comply with a normal religious practice, then he is excused from following the practice, although the obstacle must be legitimate.  On redirect, he added that the more one persists in not following a religious practice, the more he will be punished.

Plaintiff Gibb was asked whether he would like to testify, but he specified that he did not wish to testify since his testimony would be cumulative.

The first witness called by the Defendants was Billy Pierce, the Director of Chaplaincy for the prison system.  He is an ordained Baptist minister.  He testified that the prison system has 120 chaplains.  The number of chaplains is determined by the Texas Legislature.  Currently there are four Muslim chaplains and one vacancy.  The formula for the number of Muslim chaplains that are employed was established in the *Brown v. Beto* class action lawsuit.  The ratio for the number of chaplains for other faiths is approximately the same.  In addition to chaplains, there are also volunteers.  The work of the chaplains include preparing rosters, lay-in lists, inmate crises, family

4

needs, staff crises, and committee work.  The work of the chaplains is 75% administrative and 25% ministry.  There are 130 recognized religious groups in the prison system.  There are 7,300 inmates who have identified themselves as Muslim.  Chaplain Pierce testified that they try to accommodate inmates involving religious matters.  If an inmate submits a request for an accommodation, then an investigation (HQ-150) is conducted involving the inmate seeking an accommodation, the wardens where the inmate is located and the Religious Practices Committee.  They look at both religious and security concerns.  The Chaplains are not permitted to make an accommodation concerning beards because that is a security concern.

Chaplain Pierce testified that Muslim inmates are permitted to have prayer rugs, Kofi caps, prayer beads and medallions.  They are permitted to participate in Jumah prayer services and Taleem Islamic studies and Arabic or Quran studies.  Jumah and Taleem meetings are held weekly.  Jumah prayer services are conducted on Fridays.  The prison system also accommodate Muslin inmates for Ramadan activities.

The procedure for an inmate to have his religious preference shown as Muslim is simple.  The inmate must only send a request, an I-60, to a chaplain for a change.  The inmate will be contacted to make sure that the request actually came from him.  If so, then the change is shown on his inmate travel card.  An inmate may change his religious affiliation once each year.

Accommodation requests that concern security matters go to security personnel.  Chaplain Pierce testified that if inmates were permitted to receive accommodations to grow a beards for religious reasons, then the chaplains would have to maintain a data base regarding beards.  They would have to determine if the inmate belonged to a religious group that has a tenet to grow beards.  They would have to maintain the lists and distribute them to security.  Maintaining the lists would place an additional administrative burden on the chaplains.  He expressed the opinion that chaplains on bigger units would have to spend their entire time on maintaining and updating the lists.

Chaplain Pierce testified that when pork free diets were begun for religious reasons, there was a huge increase in the number of inmates who changed their religious preference to Muslim.  They changed their religious preference just because of the diet involved.  This cause hard feelings

among true believing Muslims, who came to him with complaints about inmates who were changing their religious affiliation just because of the pork free diet.  For the most part, inmates with a pork free diet were fed chicken instead of pork.  Similarly, when Native American inmates were permitted to smoke tobacco in their religious ceremonies, the number of people listing their religious preference as Native American jumped from 23 inmates to over 2200.  He fears that there will be similar problems if they allow Muslim inmates to grow beards.  He noted that other religious groups would likewise demand the right to grow beards, including Jewish offenders and Christian groups that focus on the Old Testament.  A change in policy would significantly increase the administrative duties of chaplains, at the expense of ministry duties.

On cross-examination, Chaplain Pierce testified that copies of the Quran are donated to the prison system, which are paper back editions.  Hardback editions may be purchased in the commissary.  He testified that there is one chaplain for every 1,500 Muslim inmates, which is about the same ratio for chaplains to other religious groups.  With respect to the items that Muslim inmates may possess, Chaplain Pierce testified that inmates may not have such items unless they are Muslim. He testified that there was not an increase in the number of inmates who professed to be Muslim after Muslim inmates were permitted to have prayer rugs.  However, he anticipates that the number of inmates who claim to be Muslim will grow extensively if they are permitted to grow beards.

Chaplain Pierce testified that there will not be an easy solution to the beard issue if beards are permitted.  The lists cannot be sent to just one location as there is with meals.  The list of inmates who are entitled to a pork free diet goes only to one central location.  Lists involving beards would have to go to various security locations, such as the entrances to housing areas, and have to be changed every time an inmate is moved to a new housing area.  He again testified that chaplains on larger units would have to spend all of their time on this new administrative duty. He noted that the problem with pork free diets is no longer a religious issue since all inmates can choose to have a pork free meal.  He believes that this development resulted in a decrease of the number of inmates who listed their religious affiliation as Muslim.  The number of Muslim inmates dropped from 11,000 to

7,300.  Removing the issue of a pork free diet as a religious issue eliminated an incentive for claiming to be Muslim.

In response to a question by the Court, Chaplain Pierce testified that he has no role in the policy making process regarding the grooming code.  The issue of the grooming code is entirely up to security personnel.

The final witness was Regional Director William Stephens.  He testified that the single number one priority of the prison system is public safety and security.  The grooming code prohibiting beards is a significant security concern.  Pictures are taken of every inmate.  The pictures are placed on inmates' identification cards.  If an inmate escapes, then the picture is published.  The pictures are essential for a quick recapture.  If an inmate escapes, he normally tries to change his appearance and it takes time to grow a beard.  On the other hand, if inmates were permitted to grow beards, then they could immediately change their appearance by cutting off their beards.  Permitting inmates to grow beards would be very detrimental to recapturing an inmate.  Director Stephens noted that the recapture program has been very successful.  Only one inmate is at large at this time, and he cannot be recaptured since he escaped to Mexico and Mexico will not extradite him back to Texas.

Director Stephens testified that the identification cards with the pictures are essential for security within the prison as well.  Officers must check inmates' identification cards as they move about the unit.  Inmates cannot be permitted to be out of place.  Officers at the entrances to housing areas must check the identification cards of approximately 400 inmates.  Identification is essential. The Court notes from the hundreds of prisoners trials that has been heard, that there is a problem with inmates being out of place in another housing area in order to assault and/or kill others. Director Stephens testified that prison gangs particularly pose problems.  Gangs try to distinguish themselves by appearance, particularly with tattoos, along with colors and hand signals.  The prospect of growing beards presents yet another weapon by gangs to employ in their gang activities. Gang members may also hide facial tattoos by growing beards.  He characterized gang members as little terrorists who engage in extortion and organized crime and corrupt both employees and

7

inmates.  They pose a danger to both officials and employees.  If inmates were permitted to grow beards, it would make identification more difficult.  They would have to have multiple pictures of inmates.  Beards would cause a major impediment to rapid recapture.

Director Stephens noted that the prison system has major shortages in manpower.  TDCJ currently has a shortage of 3500 officers.  They cannot hire enough people to maintain a full staff.  Turnover rates are high.  He testified that it is a daily fight to staff a facility and get everything done that must be done.  The shortages result in officers overlooking some of their duties.  Officers simply are unable to perform all of their duties.  Searches are not performed as much as they would like due to the shortages.  Permitting inmates to grow beards would magnify the problem.

Director Stephens noted that the focus of the trial is whether to permit Muslim inmates to receive clipper shave passes in order that they may grow beards up to one-fourth inch in length.  If the courts required the prison system to permit inmates to have clipper shave passes for religious reasons, then additional barber shops would have to be created.  The clipper shavers are kept in the barber shops.  Clipper shavers are expensive, and the blades must be sterilized after each use.  Although many inmates would be able to freely walk to the barber shops to use the clipper shavers, administrative segregation inmates would have to be escorted to the barber shops.  He expressed the opinion that barber shops would have to be opened in administrative segregation.  Director Stephens further testified that the clean shaven policy applies to both inmates and officers.  Officers need to be clean shaven for good hygiene.  A good seal cannot be made on gas masks when the wearer has a beard.  Nonetheless, if inmates were allowed to grow beards for religious reasons, then he would expect officers to demand to grow beards for religious reasons.

Director Stephens testified that giving some inmates privileges not available to other inmates causes problems, particularly with jealousy.  He stated that it is unfair to true believers to have other inmates infiltrate their religion just to obtain a benefit associated with that religion.  This causes strife between true believers and others.  He testified that there has been clashes within a religious group over beliefs.  Clashes recently led to the suspension of Jumah services at the Beto Unit.

8

Director Stephens noted that transport personnel transport approximately 1,500 inmates on a routine day.  For example, they transport inmates to court proceedings, like in the present case. The transport personnel must have accurate identification cards.

With respect to claims that inmates cannot hide weapons in one-fourth inch beards, Director Stephens testified that they may hide items like pieces of razor blades, handcuff keys and phone cards.  He testified that officers do not personally search an inmate's hair, but they require inmates to run their fingers through their hair.  With respect to the example cited by Inmate Green, Director Stephens noted that inmates in the mental facilities are not permitted to have razors.  There is too great a problem with suicide attempts.  Inmates in mental facilities must be clean shaven by the use of clipper shavers.  Director Stephens noted that at this time there are 800 inmates out of 20,000 inmates in this region who have clipper shave passes, which is 4%.  With respect to Gooden's comment that he has grown a beard in his high security unit, Director Stephens testified that a whole lot of things are left undone by guards in high security units.  The officers simply must prioritize their duties.  He would like the officers to be able to carry out all of their duties but they do not have the manpower to do so.  He added that inmates in high security areas who are not clean shaven can still receive disciplinary cases.

On cross-examination, Director Stephens testified that the administration would prefer that officers would not be placed in a position to prioritize their duties, but they do not have any choice due to manpower shortages.  He testified that inmates who have not shaved should always receive a disciplinary case for not shaving when they pass through the gate to their housing area.  He noted that there is a policy that pictures of inmates should be updated every five years.  The prison system is behind in keeping this goal.  Digital cameras have been purchased in an effort to update the pictures of all inmates.

Director Stephens also testified that there is not a problem of identification with respect to inmates with clipper shave passes.  Clipper shave passes are not a permit to grow one-fourth inch beards.  The inmates are still required to be clean shaven, but they are permitted to shave using a

9

clipper shaver, as opposed to a razor.  Once again, clipper shavers are kept in the barber shop. Inmates with clipper shave passes shave in the barber shop, as opposed to their own cells with disposable razors.  The primary problem with giving clipper shave passes to inmates for religious reasons is volume.  The volume of inmates going to the barber shop to use clipper shavers would increase dramatically.

<u>Discussion and Analysis</u>

RLUIPA provides that no "government shall impose a substantial burden on the religious exercise of a person residing in or confined in an institution," unless the government shows that the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2).  This standard was carried over from the Religious Freedom Restoration Act ("RFRA"), but Congress noted that courts entertaining complaints under RLUIPA would accord "due deference to the experience and expertise of prison and jail administrators."  146 Cong. Rec. S7775 (joint statement of Sen. Hatch and Sen. Kennedy, July 27, 2000).

There are five published cases which should be discussed with regard to the applicable legal standards.  These are: *Cutter v. Wilkinson*, 125 S.Ct. 2113 (2005); *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004);  *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007); *Longoria v. Dretke*, 507 F.3d 898 (5th Cir. 2007); and *Mayfield v. TDCJ*, 529 F.3d 599 (5th Cir. 2008).  In *Cutter*, members of various "non-mainstream" religions in the Ohio prison system brought suit under RLUIPA complaining that the prison officials failed to accommodate their religious exercises in various ways, including denying them access to religious literature, denying the same opportunities for group worship enjoyed by adherents of mainstream religious, forbidding them to adhere to dress and grooming requirements, withholding ceremonial objects substantially identical to those permitted to adherents of mainstream religions, and failing to provide chaplains trained in their faith.

In response, the prison officials mounted a facial challenge to RLUIPA, arguing *inter alia* that RLUIPA improperly advances religion in violation of the Establishment Clause.  The district court denied the defendants' motion to dismiss, but the Sixth Circuit reversed this decision, holding

10

that RLUIPA violated the Establishment Clause by giving "greater protection to religious rights than to other constitutionally protected rights."  This decision was in turn reversed by the Supreme Court.

The Supreme Court began its analysis by tracing the history of congressional efforts to accord religious exercise heightened protection from government-imposed burdens.  Congress responded to the Court's decision in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990) by enacting RFRA in 1993.  The Court invalidated this law in *City of Boerne v. Flores*, 521 U.S. 507 (1997).  Congress then enacted RLUIPA.  This law provides that no state or local government shall impose a substantial burden upon a person residing in or confined to an institution unless the government shows that the burden furthers a compelling governmental interest and does so by the least restrictive means.  This standard was carried over from RFRA, but Congress noted that courts entertaining complaints under RLUIPA would accord "due deference to the experience and expertise of prison and jail administrators."  146 Cong. Rec. S7775 (joint statement of Sen. Hatch and Sen. Kennedy, July 27, 2000).

In rejecting the Sixth Circuit's conclusion, the Supreme Court said first that RLUIPA is consistent with the Establishment Clause because it "alleviates exceptional government-created burdens on private religious exercise." *Cutter*, 125 S.Ct. at 2118.  The Court noted that inmates are dependent upon the government's permission and accommodation for exercise of their faith.

However, the Court then stated that "we do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety."  The Court explained that while the Act adopts a "compelling governmental interest" standard, "context matters" in the application of this standard.  The Supreme Court said that lawmakers supporting RLUIPA were "mindful of the urgency of discipline, order, safety, and security in penal institutions," quoting Sen. Hatch, and said that these lawmakers anticipated that courts would apply the Act's standard with "due deference to the expertise and experience of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of cost and limited resources."  *Id.* at 2123.

11

Finally, the Court concluded that should inmate requests for religious accommodations become excessive, impose unjustified burdens upon other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition. *Id.* at 2125.

In *Adkins v. Kaspar*, inmate Donald Adkins was a member of a church called the Yahweh Evangelical Assembly ("YEA"). He complained that he was not permitted to observe particular days of rest and worship, each Saturday for the Sabbath and certain holy days during the year. A hearing pursuant to *Flowers v. Phelps*, 956 F.2d 488, *modified in part on other grounds* 964 F.2d 400 (5th Cir. 1992) was conducted by the district court.

At the hearing, YEA elder Jerry Healan testified that the church required adherents to meet together on each Sabbath and to make particular observances on specific holy days. He said that he went to the prison unit approximately once a month to oversee Sabbath services, but that the distances involved made more frequent trips impracticable. Healan stated that 25 to 30 inmates at Coffield attended the services. Healan stated that he and Adkins corresponded regularly and that Adkins had authored several articles which were published in the YEA newsletter and on the Internet. Healan also said that he had been allowed to come to Coffield and conduct a baptismal ceremony for Adkins and other inmates.

Adkins testified that he had been granted lay-ins for holy days and the Sabbath, but that he and other YEA members could not assemble and hold services on their own. He stated that he and other YEA members had been allowed to attend tape sessions and listen to tapes sent by Healan, but that they could only do this on Mondays; tape sessions could not be conducted on Saturdays unless an accredited religious volunteer was present.

Leonard Sanchez, the senior chaplain at the Coffield Unit, testified that YEA members could congregate on the Sabbath if Healan was present (Healan was the only accredited volunteer for YEA), and that if Healan could come more frequently, arrangements would be made for YEA members to congregate, conditioned on availability of space and time. Another couple, the

12

McEnanys, had not yet been accredited as YEA volunteers, but Sanchez said that when they were, they could lead YEA services on their own.

The district court concluded that the defendants had not denied Adkins a reasonable opportunity to practice his religion and that they had not burdened his religious exercise in violation of RLUIPA.  On appeal, the Fifth Circuit first examined Adkins' claim that TDCJ policies violated his right to free exercise of religion.

The Court reviewed the test of *Turner v. Safley*, 482 U.S. 78 (1987).  This case established a four-factor "rational relationship" test for analyzing the constitutionality of regulations that burden a prisoner's fundamental rights.  Under this test, courts must consider (1) whether a valid, rational connection exists between the prison regulations and the legitimate governmental interest put forth to justify it, (2) whether there exist alternative means of exercising the fundamental right which remain open to prison inmates, (3) what impact accommodation of the asserted constitutional right would have on guards and other inmates, and on the allocation of prison resources generally, and (4) whether there is an absence of ready alternatives to the regulation in question.  *Adkins*, 393 F.3d at 564.

The Fifth Circuit noted that TDCJ's religious accommodation policy had been held to be rationally related to legitimate government objectives in *Freeman v. TDCJ*, 369 F.3d 854 (5th Cir. 2004).  In reviewing the second prong of the *Turner* test, the Fifth Circuit stated that the pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith.  In this regard, the Fifth Circuit stated that Adkins had access to religious materials, he and other YEA inmates were not required to work on the Sabbath, video and audio tapes were made available to YEA inmates on Mondays, and YEA members were permitted to hold services when Healan was able to attend.  The Fifth Circuit concluded that these accommodations were sufficient to accord Adkins and other YEA members alternative means to exercise their faith.

Next, the Fifth Circuit turned to the question of the impact which accommodation would have on guards, other inmates, and the allocation of resources generally.  The approximately 25 active members of YEA represented less than one percent of the population at the Coffield Unit; requiring the defendants to accommodate every religious holiday and requirement of the YEA, regardless of the availability of volunteers, space, or time, could "spawn a cottage industry of litigation" and have a negative impact on prison staff, inmates, and resources.  In addition, the Fifth Circuit said, if YEA were accommodated but other small religious groups were not, a perception of favoritism could arise which would have a negative impact on prison discipline and morale.

The Court concluded the discussion of Adkins' free exercise claim by stating that there was no obvious, easy alternative which would accommodate both Adkins' and TDCJ's needs.  Adkins' request, that YEA members be allowed to congregate on all Sabbaths and holy days without regard for the availability of qualified volunteers or adequate space and security was not an alternative which accommodated the prisoner's rights at *de minimis* cost to legitimate prison interests, and the chaplain testified that the Assembly could meet more often if volunteers could be present and time and space were available.

The Fifth Circuit then addressed Adkins' equal protection claim, saying first that the Constitution does not require that every religious group in prison, however small in number, have identical facilities or personnel.  The Court stated that every religious group at Coffield, except for Muslims who have a separate court order, must have outside volunteers present for meetings.  Hence, Adkins had failed to show any equal protection violation.

Adkins also complained that TDCJ's policies violated RLUIPA.  The Fifth Circuit held that in RLUIPA claims, the plaintiff first has the burden of demonstrating that the governmental practice imposes a "substantial burden" on his religious exercises.  This requires the court to answer two questions: (1) is the burdened activity a "religious exercise," and (2) if so, whether the burden is "substantial."

14

The Fifth Circuit acknowledged that the term "religious exercise" in RLUIPA means any exercise of religion, whether or not compelled by or central to a system of religious belief.  The exercise alleged to be burdened, which was the YEA Sabbath and holy day gatherings, was clearly a "religious exercise" under this definition, requiring review of the second question, whether or not the burden was "substantial."

In answering this question, the Fifth Circuit first noted that the term "substantial burden" was not defined in the statute, and different circuits had defined the term differently.  After reviewing the definitions adopted by the Seventh, Eighth, Ninth, and Eleventh Circuits, as well as pertinent Supreme Court decisions, the Fifth Circuit concluded that the proper definition was as follows:

> [F]or purposes of applying the RLUIPA in this circuit, a governmental action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly modify his religious beliefs.
>
> And, in line with the foregoing teachings of the Supreme Court, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available non-trivial benefit, and, on the other hand, following his religious beliefs.
>
> On the opposite end of the spectrum, however, a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.

*Adkins*, 393 F.3d at 569-70.  The Court again emphasized that no test may require that the religious exercise be central to the adherent's belief system; however, the Court said, "the Supreme Court's express disapproval of any test that would require a court to divine the centrality of a religious belief does not relieve a complaining adherent of the burden of demonstrating the honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion." In applying this test to Adkins, the Court said that the requirement that an outside volunteer lead worship services does not place a substantial burden upon Adkins' religious exercise, and therefore did not violate RLUIPA.  *Adkins*, 393 F.3d at 571.

15

In *Longoria*, plaintiff Juan Longoria, an inmate of Mexican and Native American descent, requested permission to grow his hair because the Great Spirit told him not to mutilate his hair.  He advised prison officials that he would not cut his hair due to his religious beliefs, and was told that an exemption could not be authorized for him under the grooming policy.  Longoria received a disciplinary case for refusing to cut his hair.  He sued under RLUIPA, and the district court dismissed the lawsuit as frivolous.

The Fifth Circuit's opinion in *Longoria* relied heavily on its opinion in *Diaz v. Collins*, 114 F.3d 69 (1997).  The Fifth Circuit made the following finding: "Because the test under RLUIPA is sufficiently the same as that previously imposed under RFRA, we hold TDCJ-ID did *not* violate Longoria's rights by, pursuant to the grooming policy, denying him permission to grow his hair." *Longoria*, 507 F.3d at 901.  The Fifth Circuit noted that it held that TDCJ-ID's grooming policy did not violate RFRA because it was related to security, it involved a compelling state interest, and the security interest at stake could not meaningfully be achieved by any different or lesser means." *Id.* at 902.  The Fifth Circuit reiterated that "in enacting the RFRA, Congress intended to continue to extend substantial deference to prison officials in legitimate security matters." *Id.*

The Court notes that RFRA and the right of Muslim inmates to grow beards was the subject of an unpublished opinion by the Fifth Circuit in *Al-Ra'id v. Warner*, No. 94-60770, 1995 WL 371215 (5th Cir. June 7, 2005).  The district court had dismissed the lawsuit as frivolous.  The Fifth Circuit noted that the plaintiffs had not challenged the findings of the district court and had not shown an abuse of discretion, thus the judgment of the district court was affirmed.

In *Baranowski*, the Fifth Circuit was concerned with a Jewish inmate's complaint that he had not been provided weekly Sabbath and other holy day services, had been denied the use of the chapel for religious services, and had been denied a kosher diet.  With respect to RLUIPA, the Fifth Circuit reviewed the standards discussed in *Cutter* and *Adkins*.  It was noted that in *Adkins* the Plaintiff and other YEA members were not prevented from congregating by prison policy but by a dearth of clergy and volunteers. *Baranowski*, 486 F.3d at 125.  The Fifth Circuit followed its decision in *Adkins* in

16

holding that the requirement that a rabbi or approved volunteer lead services did not place a substantial burden on Baranowski's free exercise of his Jewish faith, within the contemplation of RLUIPA.  *Id.*

The Fifth Circuit went own to hold that the failure to provide kosher food "may be deemed to work a substantial burden upon Baranowski's practice of his faith."  *Id.*  With respect to the compelling interest test, the Fifth Circuit made the following comments:

> Courts should apply the "compelling governmental interest" standard with "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" (citations omitted). RLUIPA, in other words, is not meant to elevate accommodation of religious observances over the institutional need to maintain good order, security, and discipline or to control costs. *See Lovelace v. Lee*, 472 F.3d 174, 190 (4th Cir. 2006).

> The uncontroverted summary judgment evidence submitted by Defendants established that TDCJ's budget is not adequate to cover the increased expense of either providing a separate kosher kitchen or bringing in kosher food from outside; that TDCJ's ability to provide a nutritionally appropriate meal to other offenders would be jeopardized (since the payments for kosher meals would come out of the general food budget for all inmates); that such a policy would breed resentment among other inmates; and that there would be an increased demand by other religious groups for similar diets.

> Based on the record before us, we hold that this policy is related to maintaining good order and controlling costs and, as such involves compelling governmental interests. . . .  Further, the administrative and budgetary interests cannot be achieved by any different or lesser means.

*Id.* at 125-26.  The Fifth Circuit upheld the granting of summary judgment on Baranowski's summary judgment claim.

The final important published opinion is the Fifth Circuit's recent decision in *Mayfield v. TDCJ*.  The Fifth Circuit was concerned with the practices of the Odinist/Asatru faith.  Odinism was described as the ancestral folk religion of Northern Europe and a polytheistic, nature-based faith that worships a variety of gods and goddesses.  Worship services, known as Blotar, involved religious paraphernalia including runestones, a blessing bowl, a non-alcoholic beverage, a drinking horn, an altar cloth, a symbolic Thor's hammer made of material such as cardboard, and a leafed evergreen branch.  The individual study of runestones was described as essential to the Odinist faith.  There were just 41 out of 2,869 inmates at Mayfield's unit who listed their religious preference as

17

Odinist/Asatru.  The plaintiff submitted affidavits showing that Blotar should be conducted at least once a month.  The only approved volunteer, who lived in Arkansas, could not come that often.  TDCJ denied Mayfield's request to conduct meetings with security present and without an outside volunteer.  The Fifth Circuit reversed the district court's grant of summary judgment noting that there were disputed issues of fact pertinent to the substantial burden inquiry, including the availability of outside volunteers and the lack of alternatives available.  The Fifth Circuit also noted that the district court failed to issue a conclusion as to RLUIPA's necessary third step: whether TDCJ has shown the application of its policy was narrowly tailored as a matter of law.  *Mayfield*, 529 F.3d at 615.

Applying these principles to the present case, the first issue for the Court's consideration is whether TDCJ has imposed a substantial burden on the religious exercise of the Plaintiff.  The evidence reveals that Muslims inmates have been permitted to exercise their beliefs in a number of ways.  They are permitted to go to various religious services and participate in Ramadan.  They are normally permitted to shower before prayer services.  A Muslim inmate is permitted to possess a prayer rug, Kofi cap, prayer beads, a medallion and a copy of the Quran.  But the issue is whether the grooming policy requiring the Plaintiff to be clean shaven imposes a substantial burden on the exercise of his religious beliefs.  The Plaintiff acknowledged that the Quran does not specifically require Muslims to wear beards, but Muslim men are required to follow the example of Mohammad, who had a beard.  Growing a beard shows obedience to Allah.  The failure to grow a beard is an act of disobedience.  Disobedience to Allah's will will condemn a person to Hell.  The Plaintiff acknowledged that opinions differ among Muslims as to whether men are required to grow beards, but he believes that he will be disobedient to Allah if he does not endeavor to grow a beard.  The evidence makes it clear that the grooming policy burdens the religious exercise of the Plaintiff.  Furthermore, the grooming code pressures the Plaintiff to act in a way that significantly violates his religious beliefs.  The Court is of the opinion, and so finds, that the Plaintiff has shown that the grooming policy imposes a substantial burden on his exercise of his religious beliefs.

18

The next issue for the Court's consideration is whether the grooming policy furthers a compelling governmental interest.  As in *Longoria*, the compelling state interest at stake in this case is security, and the grooming policy furthers that compelling governmental interest.  The grooming policy requiring inmates to be clean shaven is important for purposes of identification.  Inmates are required to have identification cards with their pictures on them.  Officers rely on the pictures in making sure that inmates are not out of place.  The prison system also relies on the pictures with respect to the recapture of escapees.  The accuracy of the pictures is essential in identification.  Beards also facilitate the transfer of contraband and weapons into and around the prison system, and the clean shaven policy eliminates the threat of inmates carrying contraband and weapons in their beards.  The Court is of the opinion, and so finds, that the grooming policy furthers the compelling governmental interest of security.

The final issue is whether the policy is narrowly tailored such that the administrative and budgetary interests cannot be achieved by any different or lesser means.  The prison system has a shortage of officers.  The officers already have a difficult burden in identifying inmates at search points due to the shortage of officers, and permitting inmates to grow beards would exacerbate the problem because identification would be less certain.  Problems with recapture would likewise be magnified if identification became more difficult due to uncertainties caused by beards.  The Plaintiff argued that the religious practice of Muslim males growing beards should be accommodated to the extent that they should be allowed to grow one-fourth inch beards.  However, growing one-fourth inch beards also makes identification more difficult.  Moreover, permitting inmates to grow one-fourth inch beards also has an economic component.  The prison system would have to build additional barber shops in order to allow Muslim inmates to use clipper shavers.  The barber shops would be an added expense, and clipper shavers are expensive.  The process of issuing clipper shave passes for Muslim inmates would also place an additional burden on chaplains, who are already burdened by the strain of their administrative duties at the expense of their ministerial duties.  It is noted that it is difficult for the prison system to fill all of the chaplain positions, and there is one

vacant Muslim chaplain position at this time.  The situation would be made worse if the Plaintiff's request for injunctive relief is granted.  Finally, as in the situation in *Baranowski*, permitting Muslim inmates to grow quarter-inch beards would breed resentment among other inmates and officers and would create an increased demand by other religious groups for similar exemptions to the grooming policy.  The Court is of the opinion, and so finds, that the grooming policy is narrowly tailored and administrative and budgetary interests cannot be achieved by any different or lesser means.

In light of the foregoing discussion and analysis, the Court finds that judgment should be entered in behalf of the Defendants.  It is accordingly

**ORDERED** that the Plaintiff's complaint is **DISMISSED** with prejudice.  It is further

**ORDERED** that all motions by either party not previously ruled on are **DENIED**.

So **ORDERED** and **SIGNED** this **6**   day of  **August, 2008.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE

20